CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ELENA SADOWSKY (Bar No. 302053)
(E-Mail: Elena_Sadowsky@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
NAMIR GREENE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>NAMIR GREENE,<br><br>　　　　　Defendant. | Case No. 2:23-CR-00209-SPG<br><br>**DEFENDANT'S SENTENCING POSITION; EXHIBIT**<br><br>Sentencing Date: November 29, 2023<br>Sentencing Time: 9:00 a.m. |

Defendant Namir Greene, through counsel of record Deputy Federal Public Defender Elena Sadowsky, hereby submits his position regarding sentencing.

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　CUAUHTEMOC ORTEGA
　　　　　　　　　　　　　　　　Federal Public Defender

DATED: November 15, 2023　　By　/s/ Elena Sadowsky
　　　　　　　　　　　　　　　　ELENA SADOWSKY
　　　　　　　　　　　　　　　　Deputy Federal Public Defender
　　　　　　　　　　　　　　　　Attorney for Namir Greene

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................... 1

II. SENTENCING POSITION .................................................................................... 1

    A.    Mr. Greene's history and characteristics support a 70-month sentence. .... 1

        1.    Mr. Greene learns early on that his role is protector and provider. ........................................................................................ 1

        2.    Mr. Greene is seduced by IM Academy and gets rich quick. ........... 3

        3.    Mr. Greene's fall. ............................................................................. 6

        4.    Mr. Greene is remorseful, uplifted by family support, and capable of redemption. .................................................................... 8

    B.    The recommended sentence accounts for the nature and circumstances of the offense, affords adequate deterrence, and protects the public. ........10

    C.    A four-level variance would not create an unwarranted sentencing disparity. ...................................................................................................13

    D.    The need to provide Mr. Greene with education, training, and treatment in the most effective manner supports this sentence. ................13

III. CONCLUSION ......................................................................................................14

# I. INTRODUCTION

Since he was a boy, Namir Greene has been programmed to believe that his worth is tied to his role as protector and provider for his mother and five sisters. When he was just 19 years old, he stumbled upon what he believed to be the vehicle to fulfill his destiny. Seduced by a multi-level-marketing company, Mr. Greene dropped out of school and devoted his time and energy to the risky world of day trading in the foreign exchange market. He was successful for a period of time, until he wasn't. He lost it all, moved back home, got evicted, lived in a Honda Accord with his mother and two minor sisters, and fell into a deep depression. It was during this downward spiral that Mr. Greene committed these robberies and carjackings.

His actions, including the trauma that he has inflicted on the victims and his own family, and the harsh advisory sentencing guidelines that they yield has haunted him for the past seven months. Though this case will define the trajectory of his life, it does not define who he is, or perhaps more importantly, who he is ready to become.

Ultimately, there are no excuses for Mr. Greene's misconduct. But the facts and circumstances here justify a variance because the guidelines do not fully capture the essential factors under § 3553(a) in this case, including: the mitigating circumstances leading up to the offense, his youth, sincere remorse, extraordinary support system, and lack of prison experience. The defense respectfully submits that a sentence of no more than 70 months (equivalent to a four-level variance) is "sufficient but not greater than necessary." 18 U.S.C. § 3553(a).

## II. SENTENCING POSITION

**A.     Mr. Greene's history and characteristics support a 70-month sentence.**

**1.     Mr. Greene learns early on that his role is protector and provider.**

Mr. Greene was raised in South Central, Los Angeles. He is the third of six children, and the only boy. These two facts--his neighborhood and his family structure--have had a profound impact on the trajectory of his young life.

Growing up, his neighborhood was impoverished and crime-ridden. It was common to witness shootings, robberies, violent fights, readily-accessible drugs, and police conflict. Houses on his block were raided by police. Ambulances constantly raced up and down the street. Distractions were everywhere.

Mr. Greene considers himself lucky, however, to have been raised by a loving mother who put him on a pedestal. As the only boy in the family, he felt that he received extra attention from his mother and his five sisters. But his parents' relationship was fractured and his father was not often around. Mr. Greene was acutely aware of his father's absence. With no "man" in the home, the family placed big expectations and responsibilities on Mr. Greene's as a young child to be the protector and the provider. Those expectations tore him apart--on the one hand, he wanted to fulfill them and lift up his family, but at the same time he wanted to run away from the pressure and felt pulled towards the streets where he saw other men seeking thrills and having fun.

For the most part, Mr. Greene was able to avoid these neighborhood distractions. He found an outlet, purpose, and community through sports. Generous friends and coaches funded his athletic endeavors when his single mother could not. He excelled at football, rugby, and track. He was scouted by Crenshaw High School where he began ninth grade and became a star athlete. At Crenshaw, he also participated in the ROTC program. After his freshman year, Mr. Greene decided to transfer to a different high school: View Park High School, an ICEF Charter School.[1] He wanted a more intimate and involved learning environment and hoped to steer clear of gangs. Mr. Greene excelled at View Park. He was an honors student, member of the chess club, a football

---

[1] "The mission of ICEF Public Schools is to prepare all students to attend and compete at the top 100 colleges and universities in the nation. ICEF (Inner City Education Foundation) operates 7 charter schools, educating over 2,500 students in grades TK through 12. ICEF is one of the first charter management organizations in Los Angeles and has become a leader in California for raising African-American achievement and closing the achievement gap." ICEF Public Schools website, available at: https://www.icefps.org/.

star, and prom king. He had the opportunity to represent his rugby team overseas in the Philippines and Hong Kong and was recognized by the L.A. Chargers organization. He was in mentorship programs and gravitated towards men of faith and men with plans because he knew he was susceptible to certain distractions given the neighborhood he came from. He graduated from View Park High School, feeling full of potential and ready to grab the world by storm. He was on the path to fulfill all of his family's expectations.



Mr. Greene beaming with happiness and potential at his high school graduation, flanked by his two younger sisters.

Mr. Greene was offered a partial football scholarship to the University of Nevada but he declined because he was unable to afford the remainder of the tuition. Instead, he enrolled in Riverside City College (RCC) where he played on the football team and majored in Communications, Psych, and Criminal Justice.

**2.  Mr. Greene is seduced by IM Academy and gets rich quick.**

In 2019, when he was just 19 years old, a RCC classmate introduced Mr. Greene to IM Academy, a multi-level marketing (MLM) company that purports to teach people

3

how to successfully trade in the foreign exchange market (forex). The foreign exchange market is responsible for trading the world's currencies. It is a large market that is relatively easy to start trading on. "Because it's so easy to start trading on it, forex is touted as a way to make quick cash . . . But the stark reality is that forex trading is very risky, no matter how you approach it. The vast majority of people who try it lost money." *Influences Are Touting Another Dodgy Get-Rich-Quick Scheme*, VICE, available at: https://www.vice.com/en/article/akdjz4/geordie-shore-towie-forex-trading-t.

Though legal, IM Academy and its European counterparts in particular, have been criticized by some outlets as a get-rich-quick fantasy that targets and scams young people and a pyramid scheme.[2] IM Academy charges an initial $200 fee to join the program. After that, there is a $175 month fee to access IM Academy's trainings and educational materials. Consistent with the traditional MLM model, a member receives a bonus and/or a monthly commission for bringing in additional people to their network and maintaining them in the network.

After his classmate's presentation, Mr. Greene was intrigued and signed up to join IM Academy. He devoted significant time to studying the materials and learning the "tricks of the trade." It took him 10 months, but he finally started to make a profit through forex day trading. At this point, he was "all in." He left RCC to focus on IM Academy full time. By the end of 2020, he had built a network of nearly 800 people globally. As his network grew, so did his paycheck and his stress. His success and paycheck depended on the success of people in his network. He had to keep 800 people

---

[2] *See, e.g.*, *Families in Despair Over IM Academy: The crypto-sect has kidnapped our children*, El Pais (April 18, 2022), available at: https://english.elpais.com/international/2022-04-18/families-in-despair-over-im-academy-the-crypto-sect-has-kidnapped-our-children.html#:~:text=%E2%80%9CThey%20have%20kidnapped%20our%20children,to%20prevent%20recruitment%20by%20sects; *Is this Company a Forex-Trading Pyramid Scheme?*, Institutional Investor (August 8, 2018), available at: https://www.institutionalinvestor.com/article/2bsxlvfb3w5uv28jcmvb4/corner-office/is-this-company-a-forex-trading-pyramid-scheme

happy and making money each month so that they would continue to pay the $175 monthly fee and would continue to receive his monthly commissions. At the height of his success with IM Academy, he was earning $6000 per month just from his network commissions. This was on top of whatever he made from his own personal trading. It was the most money he had ever seen. Through the company, he traveled to Texas, Arizona, Atlanta, Mexico, Alaska, Tennessee, Mississippi, and Las Vegas. He sponsored trips and events for people in his network. It was an exciting adventure for the 21 year old. It gave him a sense of community and purpose that reminded him of when he played sports. He felt like he had tapped into his potential. He was fulfilling his duty as protector and provider. He was on top of the world.



Mr. Greene during the height of his IM Academy success, beaming with pride.

### 3. Mr. Greene's fall.

Despite his outward appearance and the "skills" that he learned from IM Academy, Mr. Greene did not know how to manage money and he managed his own money poorly. He lived in a nice penthouse apartment at Circa in downtown Los Angeles. He gave away a lot of money to his family. He spent too much on trips and other things to help build his brand and network.

For many MLM enterprises, there comes a point when the network begins to fizzle out and all avenues of expansion are tapped out. Eventually, Mr. Greene saw his network dwindle down to 600 people, then 400, then 300 and so on. But he still had monthly expenses from the "good days" of his 800-person network. Towards the end of 2022, Mr. Greene was at "ground zero." He broke his lease at the penthouse apartment and moved in with girlfriend. When they broke up, Mr. Greene moved in with his mother and two younger sisters. It was only then that he discovered that his mother was in dire financial straits. Despite all of the money he had been sending her, she too had not managed her money well.

//
//
//
//
//
//
//
//
//
//
//
//

In December 2022, they found themselves in eviction proceedings. On December 16, 2022, Mr. Greene posted to his Instagram account:



In January 2023, Mr. Greene, along with his mother and two younger sisters, were living in their Honda Accord. They put the majority of their belongings in a U-Haul storage unit. They bought a gym membership so that they could use the gym showers. Mr. Greene's two sisters were still in high school and would do their

7

homeschooling from a laptop in the car while Mr. Greene also used the car for job interviews when he could. Mr. Greene struggled to find employment. He interviewed to be a flight attendant with Delta but never heard back after the interview. He took a job at a warehouse making minimum wage but it was not enough to support his mother and sisters. As the appointed provider and protector, he had failed. Two months later, in March and early April 2023, Mr. Greene committed the instant offenses.

During this difficult time, Mr. Greene buried his feelings and his fear. Despite having a loving circle of family and friends, he thought he had to shoulder this burden and this stress alone. Many of his friends had no idea he was living in his car, struggling to take care of his family. His family had no idea he was struggling with a deep depression and debilitating sense of failure. Before his fall, Mr. Greene had a history of using drugs, but it was primarily for recreational purposes in social settings and at parties. After his fall, his drug use changed. He started using drugs to drown his sorrows and escape his reality. He self-medicated his deep lows with intense highs. He recalls that the drastic swing in feelings often resulted in feelings of invincibility. He was high when he committed each robbery.

### 4. Mr. Greene is remorseful, uplifted by family support, and capable of redemption.

There are several common threads in the letters submitted by family and friends.

First, Mr. Greene's actions shocked his family and friends. That is not the man they knew. The letters provide some insight into the charismatic, bright, young man that Mr. Green was (and still is). Despite his gifts and talents, he remained humble and respectful. As one friend recounts:

> Namir left a huge impression on me the day I walked into his
> family's living room and I witnessed him wash and massage
> his grandmother's feet with the care only a loving grandson
> could have. He was on his knees rubbing her feet as she sat on

8

the couch and they were conversing. To me, it was a sign of humility and nobility that is rare in today's world.

Ex A at 12.

The other letters recount his kind gestures, like when he bought a blanket, sweater, socks, and hot coffee for a woman sleeping on the street (*Id*. at 1, 13); his constant encouragement and how "he made you feel bigger than what you saw yourself." (*Id*. at 12); his joyful presence like when he dances in the middle of a Target store (*Id*. at 8); and so much more.

Second, it is clear that Mr. Greene sincerely regrets his actions. He knows that his life and the victims' lives have been changed forever--and drastically--because of his actions. When he first entered custody, he could not bear to face his family and friends. It took several months for him to accept the outpouring of love and support that they have shown him despite his unthinkable actions. He has expressed shame and embarrassment to his family and friends. He feels a deep heartache when he imagines the trauma he has likely caused the victims and witnesses. He has said that he "had to silence his heart" to do what he did. His heart is no longer silent. He accepts that he must be punished, but is also ready to accept love again so that he can heal.

Finally, the letters show that Mr. Greene has a large support network full of thoughtful and committed people. Now that Mr. Greene's struggles have come to light, his circle can address those struggles *with* him. He will never suffer in silence again. They plan to support him throughout his custodial term and beyond.[3]

---

[3] Mr. Greene is still on the fence about whether he wants to invite his family and friends to his sentencing hearing--a decision that undersigned counsel will respect. He fears that they may not be emotionally ready to accept the sentence that he is ready to accept. Undersigned counsel brings this to the Court's attention because their absence at sentence should not be interpreted as a lack of support.

9

**B.   The recommended sentence accounts for the nature and circumstances of the offense, affords adequate deterrence, and protects the public.**

Mr. Greene committed a serious crime, and the defense recognizes that it merits a substantial term in custody. But while his offense is serious, it is mitigated by its context: the expectation that he provide and protect his family which was engrained in him since he was a child, his quick success through IM Academy and even quicker fall as a 23-year-old, his experience living in his car with this mother and two minor sisters in the months leading up to the offense, his spiral into drug use to escape his pain. The 23-year-old who committed this crime must be understood in the context of this background. Moreover, though his crime was dangerous, he did not intend for anyone to get hurt and would not have physically harmed anyone.

Mr. Greene's youth at the time of the offense is also a significant mitigating factor. Scientific research on brain development shows that the process of maturity continues well into a person's twenties, with the pace of maturation in boys slower than that of girls.[4] "The evidence is now strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable[.]" Juv. Just. Ctr., Am. Bar Ass'n, *Adolescence, Brain Development, and Legal Culpability* (2004).

This research mitigates Mr. Greene's offense conduct and demonstrates why it is not predictive of his future behavior. The Supreme Court has long recognized that, according to scientific research, juveniles have "'a lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and

---

[4] *See* Emily Buss, *What the Law Should (And Should Not) Learn From Child Development Research*, 38 Hofstra L. Rev. 13, 39-40 (2009); *see also* Selen Siringil Perke & Lael Chester, *Emerging Adults: A distinct population that calls for an ageappropriate approach by the justice system*, Emerging Adult Sci. in Mass. 1 (Jun. 2017) (finding that "cognitive skills and emotional intelligence continue to develop into a person's mid-20s, and even beyond").

10

heedless risk-taking." *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)). The Court has also noted that "children are more vulnerable . . . to negative influences and outside pressures," and that "they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* (internal quotation marks and citations omitted). The Court has cited "developments in psychology and brain science that continue to show fundamental differences between juvenile and adult minds," particularly that "parts of the brain involved in behavior control continue to mature through late adolescence." *Graham v. Florida*, 560 U.S. 48, 68 (2010). The Court has reasoned that "those findings—of transient rashness, proclivity for risk, and inability to escape consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Miller*, 567 U.S. at 472. And while *Miller*, *Graham*, and *Roper* repeatedly make distinctions between "juvenile" and "adult" offenders, the Court was clear in *Roper* that "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 543 U.S. at 573.

All these cases, and the scientific research on which they are based, suggest that as a result of Mr. Greene's youth, a sentence beyond 70 months is not necessary for deterrence. As the Supreme Court held nearly thirty years ago, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson v. Texas*, 509 U.S. 350, 368 (1993). Research on juvenile offenders has borne this out, showing a significant drop in crime with psychological maturity.[5]

---

[5] *See, e.g.*, Paul Atkinson, *Age and the Decline in Crime* (Apr. 16, 2013), https://news.asu.edu/content/age-and-decline-crime (observing that "crime peaks around age 17, 18" and declines with psychosocial maturity); Gary Sweeten et al., *Age*

11

In this case, it is psychological counseling, vocational training, and drug treatment—rather than extensive incarceration—that is more likely to reduce Mr. Greene's risk of further impulsive behavior and criminal conduct. For a young man at such an impressionable age, a lengthy prison term will keep him out of the workforce, separate him from his supportive family, and surround him with older men with lengthier criminal histories. In short, it risks setting in stone the path that led him to commit this crime.

Finally, the question is not whether a sentence of longer than 70 months would promote deterrence and public protection, but what is the minimum term *necessary* to comply with those goals. *See* 18 U.S.C. § 3553(a). There is no evidence that lengthier sentences have proportionately greater deterrent value, as the Department of Justice has itself acknowledged.[6] What will ultimately avoid recidivism and protect the public is rehabilitation.

---

*and the explanation of crime, revisited*, J. Youth Adolesc. (Jun. 2013), https://pubmed.ncbi.nlm.nih.gov/23412690/ (original study).

[6] Nat'l Inst. of Justice, *Five Things About Deterrence*, https://nij.ojp.gov/topics/articles/five-things-about-deterrence. This reality is widely accepted across deterrence scholarship. In the late 1990s, the British government asked the Institute of Criminology at Cambridge University to conduct a review of deterrence research. The resulting report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and Per-Olof H. Wilkstrom, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*, Oxford: Hart Publishing (1999). The certainty of punishment is more effective for deterrence than the severity of punishment. *See* Daniel Nagin and Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, Criminology 39(4) (2001); David Farrington, Paul Langan, Per-Olof H. Wikstrom, *Changes in Crime and Punishment in America, England and Sweden between the 1980s and 1990s*, Studies in Crime Prevention 3:104-131 (1994).

12

### C. A four-level variance would not create an unwarranted sentencing disparity.

The majority of courts in this district impose below-guidelines sentences for robbery offenses. According to the statistics from the 2022 fiscal year, there were 24 robbery cases in the Central District of California. *See* U.S. Sentn'g Comm'n, *Statistical Information Packet Fiscal Year 2022 Central District of California*, at 16 (2022), *available at* https://www.ussc.gov/research/data-reports/geography/2022-federal-sentencing-statistics (click on "California Central"). Of the robbery sentencings that occurrent that year, 10 sentences (41.7%) varied below the advisory guidelines range, six sentences (25%) departed below the advisory guidelines range, eight sentences (33.3%) were within the advisory guidelines range, and zero sentences went above.[7] *Id*. This is similar to the national statistics, with 44.2% of sentences varying below the advisory range and 37% of sentencing being within the advisory range. The median sentence imposed for robbery offenses in this district was 70 months[8]--the same sentence Mr. Greene recommends. *Id*. at 11.

### D. The need to provide Mr. Greene with education, training, and treatment in the most effective manner supports this sentence.

Additional prison time, beyond 70 months, would not serve the rehabilitative purposes of sentencing. That amount of custodial time is more than sufficient for Mr. Green to take advantage of the educational and rehabilitative services that the Bureau of Prisons has to offer, including mental health treatment, vocational training, and educational opportunities. *See Tapia v. United States*, 564 U.S. 319, 335 (2011) ("[A] court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation."). Mr. Greene is committed to using his time in custody wisely. He has already begun to take advantage of the

---

[7] Thus, Probation's above-guideline recommendation in this case is highly unusual and would create an unwarranted sentencing disparity.

[8] The mean sentence was 94 months.

13

(limited) opportunities available to him in pretrial detention, mainly the non-residential RDAP program at MDC. PSR ¶ 133. Mr. Greene has enjoyed the group aspect of the program. Every Thursday, 20 men of different races and ages come together and can relate about a significant part of their life. Mr. Greene enjoys to the discussion topics and takes comfort in knowing that he is not alone in this journey. That he has seized the educational opportunities available to him in pretrial detention, which are limited, show that he is serious about rehabilitation. Though Mr. Greene welcomes additional substance abuse treatment and admits that he was under the influence during each robbery, he is unlikely to qualify for RDAP as a result of his robbery conviction. Fortunately, the drug and alcohol treatment this Court can provide in the community far surpass the resources available inside the prison walls. For this reason, the defense's proposed sentence includes three years of supervised release—the maximum available—which will provide him with the treatment, support, and oversight he needs to adjust from prison to life on the outside.

### III. CONCLUSION

For these reasons, Mr. Greene recommends a sentence of no more than 70 months -- a significant sentence for a young man who has never served any custodial sentence before.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 15, 2023       By  /s/ Elena Sadowsky
                                   ELENA SADOWSKY
                                   Deputy Federal Public Defender
                                   Attorney for Namir Greene